[No. F017724. Fifth Dist. Feb. 1, 1995.]

CARL L. OTT et al., Plaintiffs and Appellants, v.
ALFA-LAVAL AGRI, INC., et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of subparts 2. and 3. under I.A., subpart I.B., and all of part II.

## Counsel

John J. Machado and Patricia Melugin Cousins for Plaintiffs and Appellants.

Turner & Boisseau, Eldon L. Boisseau, Anne M. Hull, McCormick, Barstow, Sheppard, Wayte & Carruth, David H. Bent and Michael J. Czeshinski for Defendants and Appellants.

## Opinion

**VARTABEDIAN, J.**—Plaintiffs, owners of a family dairy farm, sued defendants, milking machine manufacturers, for lost profits and general and punitive damages. After a jury trial and various posttrial proceedings, judgment was entered for plaintiffs on two counts and for defendants on the remaining counts. Both parties appeal, raising more than 20 issues arising from virtually every stage of the case. Upon full consideration of the dispositive contentions of the parties, we conclude the trial court should have entered judgment for defendants on all counts. The published portion of our discussion concerns the appropriate factors in a negligence action for determining the recoverability of economic damages absent injury to person or property.

### FACTS

Plaintiffs, husband and wife, owned a dairy farm in Stanislaus County. They operated the farm with their two adult sons.

In 1970, plaintiffs purchased an automatic milking system manufactured by defendants (the 1970 system). The milking system was composed of several separate parts. At each of eight milking stalls there was a milking "claw." Four teat cups were attached by hose to the claw. Each teat cup held a disposable rubber liner that fit over the cows' teats during milking. The claw collected the milk and transferred it through a vacuum line to a collection tank.

The teat cups were held on to the cow by low level vacuum from an electric pump. When milking began, a higher vacuum was supplied by a larger electric pump. The vacuum produced by the larger pump was controlled by a pulsator so that it produced a suckling effect at the teat. The vacuum could be adjusted by means of a vacuum controller. A milk-flow sensor switch turned off the high vacuum pump when the udder emptied.

All of this equipment, except the collection tank, was manufactured by or for defendants and was known as the DeLaval 200 System. The system was sold to plaintiffs by defendants' local independent distributor, Modesto Dairy Supply (MDS). Because plaintiffs' system was the first of its kind installed in the western United States, an employee of defendants was present during MDS's installation of the milking system.

Plaintiffs were satisfied with the 1970 system, and continued using it uneventfully for the next 15 years.

In 1985, there was a surplus of milk production capacity in the United States, and, according to plaintiffs, creameries were raising milk quality standards as a means of seeking to control supply. Plaintiffs decided it was necessary to modernize their milking system to improve milk quality. They purchased from MDS the defendants' latest milking system. That system was known as the SST system, an acronym for solid-state takeoff, and is referred to herein as the 1985 or SST milking system.

The SST system operated much as the 1970 system had, and used the same high vacuum pump, vacuum controller, pulsators, claws and teat cups. There were two primary differences between the 1970 system and the SST system. First, the SST did not use a low-vacuum line to keep the teat cups attached. Second, the SST used a circuit board connected to the milk-flow sensor to cause the vacuum to shut off when milking was completed. As a result, the cups were immediately removed from the teats when milking was completed.

The eight SST circuit boards were powered by twenty-four-volt current provided by a single transformer. Installation diagrams required the transformer to be grounded. The SST circuit board and control switches were assembled by defendants in a plastic waterproof box designed to be placed near each milking stall. A dairy barn is at times wet and dirty, however, so plaintiffs directed MDS to remove the circuit boards from the control box, and to mount the circuit boards near the 24-volt transformer in a cleaner, drier part of the barn. MDS did so.

Soon after the installation of the SST system in 1985, plaintiffs began noticing problems with the system. Initially, the teat cups were coming off too soon, so all the milk was not being evacuated from the cows' udders. After modification of the equipment and changes in milking procedures, that

problem subsided to an extent. However, plaintiffs began seeing high somatic cell counts[1] and many cows were "drying off" too soon.[2]

Plaintiffs sought assistance with the milking system from MDS and defendants' regional representative, and sought solutions to the perceived problems through consultations with their feed supplier, veterinarian and others. Eventually, plaintiffs became convinced their problems were caused by stray voltage emanating from the milking system and shocking the cows while they were being milked.[3]

In early 1988, plaintiffs contacted defendants about this problem. In addition, plaintiffs hired an electrical consultant, Urwyler, who came to the farm to investigate the problem. The electrical consultant disconnected the ground on the low-voltage side of the transformer, and plaintiffs' problems seemed to abate for a time.

After he was contacted by plaintiffs, defendants' director of engineering retained the services of a stray-voltage consultant, and scheduled a visit at plaintiffs' farm. Defendant's stray-voltage consultant, Craine, and the director of engineering, Hunt, spent two days at plaintiffs' farm in March 1988. Craine examined the electrical aspects of the milking system and the dairy.

---

[1] There is always some sloughing and replacement of cells within the udder, and these cells are acceptable in milk at normal levels. However, infection and irritation inside the udder can cause a higher level of sloughing and the production of infection-fighting white blood cells which are also deposited in the milk. When the cell count becomes too high, the cow is removed from the milking herd and treated with drugs or dietary supplements. The cow remains unproductive until the condition ameliorates.

[2] The evidence showed that dairy cows are optimally on a 13-month reproduction cycle. After the birth of a calf, the mother is placed in the milking herd. She is milked for the next 305 days, and during that time she is impregnated again. Over the course of the 305 days, the cow's milk production gradually decreases, until it reaches an economically inefficient level at the end of the period. Then the cow is removed from the milking herd until the next calf is born at the end of the 13th month, and the cycle begins again. The "dry period" prior to calving permits the udder to heal and the cow to put on weight. Plaintiffs perceived that many of their cows were losing productivity well before the 305-day cycle had run its course. In addition, difficulties attaining timely conception caused a longer period before the cows reentered the milking herd.

[3] An animal touching both an electrical source and the ground can create what is an unintended electrical circuit. In circumstances dependent on a number of interrelated factors, the difference in the degree of electrical potential, or voltage, between two points of the electrical circuit completed by the animal can result in a noticeable current through the animal. The parties' experts disagreed about virtually every aspect of the stray voltage problem, from the conditions producing stray voltage to the amount of current necessary to produce a noticeable effect, and to the proper methods for investigating the existence of stray voltage. There was no disagreement, however, that at some level an electrical current through the cow could result in nervousness and reduced milk production, both in the short term and the long term.

Hunt observed milking procedures and conducted a general examination of the milking system; the evidence of the parties differed concerning the thoroughness of this examination.

At the end of the March visit, Hunt informed plaintiffs that the milking system was not causing their production problem, and that they should "look elsewhere." Accordingly, plaintiffs contacted the University of California Extension Service, which assembled a team of experts to evaluate plaintiffs' dairy operation. Plaintiffs also arranged for their own electrical consultant to be at the farm with this inspection team.

A few days before the scheduled arrival of the inspection team, Hunt and Craine came to the farm unannounced. They again conducted an examination of the farm for the next three days. At the end of the visit, Hunt again assured plaintiffs that defendants' equipment had nothing to do with plaintiffs' production problems. Hunt asked plaintiffs what they would do in light of Hunt's conclusions. Plaintiffs said they would continue with their plans for inspection by the extension service team.

The extension service team visited the farm in April 1988. A few days later, they sent a letter to plaintiffs with several suggestions for modifying their milking procedures. One suggestion was to lower the vacuum level of the milking machines. Plaintiffs made arrangements for MDS to change the vacuum level, but when the change was made, the milking machines fell off the cows. Plaintiffs restored the original vacuum level and called in another dairy supply company to evaluate the milking system.

Tony Betschart of Modern Milking Company examined and tested the system. He concluded plaintiffs needed a larger vacuum pump. He offered plaintiffs the opportunity for a "second opinion" by an independent milking equipment consultant. They agreed, and Betschart put Steven Jolley in touch with plaintiffs. After Jolley examined and tested the system, he too recommended a larger vacuum pump. Plaintiffs had the recommended pump installed immediately by Betschart in May 1988.

Betschart and Urwyler continued to search for stray voltage in the milking barn. In June 1988 they rewired the remote controller boards to eliminate stray voltage. Finally, in May 1988, plaintiffs and Betschart decided stray voltage was endemic to defendants' system, and plaintiffs directed Betschart to replace the remainder of the SST system. According to plaintiffs, their loss of production ended, and they began rebuilding their dairy herd.

### PROCEDURAL HISTORY

This case went to trial on plaintiffs' second amended complaint, which asserted causes of action against both defendants and MDS, who settled with

plaintiffs prior to completion of trial. On the first day of trial, five of the fifteen counts were determined to be against MDS only. The remaining 10 counts were alleged against defendants, in some cases alone and in some cases in conjunction with MDS.[4]

At the close of plaintiffs' case, defendants moved for nonsuit. Plaintiffs were allowed to reopen, and they presented additional evidence. The court then granted defendants' motion for nonsuit as to counts 6, 7, 8, 9 and 11.

At the close of all evidence, defendants moved for a directed verdict. That motion was granted as to count 4 and in part as to count 2. As to both counts, the trial court found there was insufficient evidence of agency or any other basis to permit those counts to go to the jury on a vicarious liability theory. The court also determined there was insufficient evidence of negligence concerning the manufacture and design of the 1985 system to permit count 2 to go to the jury on that issue. The court limited counts 5 and 13 to issues arising out of the events of 1988 and afterward, and directed a defense verdict on the count 5 claim for punitive damages.

The case was submitted to the jury on four counts, and the jury returned special verdicts as follows:

Count 1, products liability, defense verdict;

---

[4]In ruling on defendants' motion for judgment on the pleadings and defendants' and MDS's motions *in limine* on the first day of trial, the court limited the claims to be presented to the jury. Thus, at the beginning of plaintiffs' case, there were the following counts:

First cause of action, for products liability, limited to damages from 1985 forward.

Second cause of action, for negligence by manufacturer, limited to physical injury and general damages from 1985 forward. Economic damages were excluded.

Fourth cause of action, for negligence per se (electrical code violations in installation of 1985 system), limited to physical injury and general damages from 1985 forward. Economic damages were excluded.

Fifth cause of action, for fraud and deceit, limited to damages from 1985 forward. Economic damages permitted.

Sixth cause of action, for breach of implied warranty, limited to the cost of the 1970 vacuum pump plus property and economic damages from 1985 forward.

Seventh cause of action, not fit for intended purpose, limited to the cost of the 1970 vacuum pump plus property and economic damages from 1985 forward.

Eighth cause of action, for breach of express warranty, limited to property and economic damages from 1985 forward.

Ninth cause of action, for negligent advice, limited to noneconomic damages from 1985 forward.

Eleventh cause of action, for negligent infliction of emotional distress, limited to noneconomic damages from 1985 forward.

Thirteenth cause of action, for negligent (mis)representation, limited to noneconomic damages from 1985 forward.

Count 2, negligence of manufacturer, as previously limited to 1985 and forward damages from the 1970 milking system, $40,000 general damages verdict for plaintiffs;

Count 5, fraud and deceit: $490,000 economic damages and $160,000 general damages verdict for plaintiffs;

Count 13, negligent misrepresentation: $160,000 general damages for plaintiffs, as per count 5.

The court granted defendants' motion for judgment notwithstanding the verdict (hereafter JNOV) on count 2. The court granted defendants' motion for new trial on the economic damages portion of the count 5 verdict. The court denied defendants' motion for new trial based on plaintiffs' counsel's alleged misconduct. The court granted defendants' motion to offset the verdict by the full amount of the settlement with MDS, $200,000.

The final amended judgment for plaintiffs was in the amount of $13,542.39, excluding any amount recovered on retrial of the fraud and deceit economic damages issue.

## DISCUSSION

### I.

### *The Otts' Appeal*

#### A.   *Count 2 Issues*

Count 2 of the second amended complaint is subtitled "Negligence by Manufacturer." That count alleges defendants negligently designed and manufactured the 1970 milking system, and negligently trained and directed MDS in the installation thereof. Count 2 also alleges defendants negligently designed and manufactured the 1985 milking system, and negligently trained and directed MDS in the installation thereof. At various stages of the trial, the court restricted the scope of this count, eventually entering JNOV on defendants' motion. Plaintiffs raise several separate issues arising from the court's treatment of count 2. We publish only the discussion concerning economic damages.

#### 1.   *Economic Damages (Lost Profits)*

By way of motion for judgment on the pleadings filed at the beginning of trial, defendants obtained a ruling that economic losses were not a compensable element of damages in an action for negligence. The trial court granted

the motion for two reasons: (1) economic damages are not recoverable for the tort of negligence without physical damages, and (2) those few cases that hold to the contrary only permit such recovery where a contract or warranty claim is unavailable, whereas the present plaintiffs pleaded both contract and warranty causes of action.

Plaintiffs challenge this ruling, contending Supreme Court precedent requires they be permitted to recover economic damages.[5]

Defendants argue that the case relied on by plaintiffs, *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60] (hereafter *J'Aire*), is a narrow exception to a general rule that commercial transactions are not covered by tort law, since the Uniform Commercial Code and other commercial statutes provide a considered legislative approach to reasonable commercial expectations. Defendants contend plaintiffs' contractual and warranty remedies, as alleged in the complaint, would have been adequate to compensate them for legitimate economic loss. They also contend economic damages for negligence were properly denied under *J'Aire*'s requirement that such losses, to be compensable, must not be part of plaintiffs' "ordinary business risk." (See *id.* at p. 808.)

In their reply brief, plaintiffs assert that *J'Aire* and cases following it all involved pleadings of alternative contract/warranty counts, and still permitted tort recovery of economic damages. Plaintiffs also contend their claims for economic damages should have been revived when the court nonsuited their contract and warranty claims, leaving them with no alternative remedy.

At the time of trial in this case, motion for judgment on the pleadings was an informal procedure, specifically authorized neither by statute nor by rule. (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 262, p. 564; see Code Civ. Proc., § 438, originally enacted by Stats. 1993, ch. 456, § 5.) By common practice, however, the motion functioned in much the same way as a general demurrer, and, when brought by a defendant, it challenged whether the complaint states a cause of action on its face. (6 Witkin, Cal. Procedure, *supra*, at § 263, p. 564.)

---

[5]This question resurfaces in another issue raised by plaintiffs: The parties agree economic damages are available for fraud, and the jury awarded plaintiffs $490,000 in economic damages from the 1988 fraud (count 5). The court granted a new trial on those damages because there was no way to tell what portion of the post-1988 economic damages arose from the negligent manufacture of the milking systems and what portion arose from the fraudulent concealment of such negligence. Plaintiffs argue the order for a new trial is erroneous because they were entitled to economic damages on both counts 2 and 5, so there is no need to apportion the damages, and there is no uncertainty. In light of our disposition of other issues concerning count 5, we do not reach this secondary application of plaintiffs' economic damages argument.

Review of a judgment on the pleadings requires the appellate court to determine, de novo and as a matter of law, whether the complaint states a cause of action. (See *Gill* v. *Curtis Publishing Co.* (1952) 38 Cal.2d 273, 275 [239 P.2d 630].) For purposes of this review, we accept as true all material facts alleged in the complaint. (*San Francisco Internat. Yachting etc. Group* v. *City and County of San Francisco* (1992) 9 Cal.App.4th 672, 676 [12 Cal.Rptr.2d 25].) Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion. (*Galligan* v. *City of San Bruno* (1982) 132 Cal.App.3d 869, 875-876 [183 Cal.Rptr. 466].)

Although we conclude reasons in support of the trial court's ruling are erroneous, we affirm the grant of judgment on the pleadings as it relates to negligence-based claims for economic damages. On appeal, we review the trial court's disposition of the matter, not its reasons for the disposition. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 259, p. 266.) In this instance the trial court's disposition was correct.

■ Contrary to the trial court's conclusion, economic damages, standing alone, can be recovered under some circumstances in an action for negligence. "[A]n injury to the plaintiff's economic interests should not go uncompensated merely because it was unaccompanied by any injury to his person or property." (*J'Aire*, *supra*, 24 Cal.3d at p. 805; *Seeley* v. *Seymour* (1987) 190 Cal.App.3d 844, 860 [237 Cal.Rptr. 282] [collecting cases]; see Prosser & Keeton on Torts (5th ed. 1984) § 129, pp. 1001-1002 [criticizing *J'Aire*]; see also Schwartz, *Economic Loss in American Tort Law: The Examples of J'Aire and of Products Liability* (1986) 23 San Diego L.Rev. 37, and Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment* (1985) 37 Stan.L.Rev. 1513.) Further, the reasoning of *J'Aire* is wholly incompatible with a limitation of the cause of action to those instances in which the plaintiff and defendant are not in privity, the secondary basis for the trial court's ruling.

Nevertheless, *J'Aire* does require that the parties have a "special relationship" for such a cause of action to arise. (*J'Aire*, *supra*, 24 Cal.3d at p. 804.) That special relationship must give rise to a duty on the part of the defendant to use due care to avoid economic injury to the plaintiff. (*Id.* at p. 803.) In the context of a motion for judgment on the pleadings, this means the complaint must allege facts constituting such special relationship. We conclude that the second amended complaint fails to allege such facts, and the proof at trial precludes amendment of the complaint to make the required allegations.

The *J'Aire* opinion succinctly set the scene. "Appellant, a lessee, sued respondent, a general contractor, for damages resulting from the delay in

completion of a construction project at the premises where appellant operated a restaurant. Respondent demurred successfully and the complaint was dismissed. This court must decide whether a contractor who undertakes construction work pursuant to a contract with the owner of premises may be held liable in tort for business losses suffered by a lessee when the contractor negligently fails to complete the project with due diligence." (*J'Aire, supra,* 24 Cal.3d at p. 802.)

As alleged in the *J'Aire* complaint, respondent's contract with the owner of the building required respondent to complete the project within a reasonable time. The work was not completed within a reasonable time, and appellant suffered a loss of business and profits. (*J'Aire, supra,* 24 Cal.3d at p. 802.)

The Supreme Court began its analysis by noting, "Liability for negligent conduct may only be imposed where there is a duty of care owed by the defendant to the plaintiff or to a class of which the plaintiff is a member." (*J'Aire, supra,* 24 Cal.3d at p. 803.) Such duty can arise from statute or contract, the nature of defendant's activity, the relationship between the parties, "or even the interdependent nature of human society." (*Ibid.*) The issue is " ' "whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' [Citations.]" (*Ibid.*)[6]

The *J'Aire* court then noted that a party's interest in prospective economic advantage is a protected interest in various circumstances. Not only is such interest protected when the economic injury is collateral to other personal injury or property damage, but it also is protected "[w]here a special relationship exists between the parties." (*J'Aire, supra,* 24 Cal.3d at p. 804.)

The court then examined the nature of this "special relationship," using criteria formulated in *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358].[7] (*J'Aire, supra,* 24 Cal.3d at p. 804.) Existence of the special relationship depends on "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm." (*Ibid.*) (This is referred to herein as the six-part formulation or test.)

---

[6]The existence of duty is a question of law for the court. (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278].) On appeal, we independently review that issue. (*Koepke* v. *Loo* (1993) 18 Cal.App.4th 1444, 1451 [23 Cal.Rptr.2d 34].)

[7]*Biakanja* held that an intended beneficiary could sue the preparer of a will to recover a legacy lost through the negligent preparation of the will.

In assessing the claim of duty in the case before it, the court "eschewed overly rigid common law formulations of duty in favor of allowing compensation for foreseeable injuries caused by a defendant's want of ordinary care. . . . Rather than traditional notions of duty, this court has focused on foreseeability as the key component necessary to establish liability . . . ." (*J'Aire, supra*, 24 Cal.3d at pp. 805-806.)

In *J'Aire*, the court noted that the contract specifically contemplated improving the space occupied by appellant. "Thus respondent's performance was intended to, and did, directly affect appellant." (*J'Aire, supra*, 24 Cal.3d at p. 804.) Injury to appellant was "clearly foreseeable," and this likelihood of injury was "repeatedly drawn to respondent's attention." Finally, public policy imposes on contractors in various circumstances the duty to finish a project with diligence and to avoid injury to the person or property of third parties. (*Id*. at pp. 804-805.) The court concluded respondent had a duty to complete the project without unnecessary injury to appellant's economic interests.

The Supreme Court then turned to the issue of damages. Previous cases had suggested that "recovery may not be had for negligent loss of prospective economic advantage," when not accompanied by personal injury or damage to property. (*J'Aire, supra*, 24 Cal.3d at p. 806.) The court held that this was not the rule in California. "Recovery for injury to one's economic interests, where it is the foreseeable result of another's want of ordinary care, should not be foreclosed simply because it is the only injury that occurs." (*Ibid*.)

The court summarized its holding in this language: "[R]ecovery for negligent interference with prospective economic advantage will be limited to instances where the risk of harm is foreseeable and is closely connected with the defendant's conduct, where damages are not wholly speculative and the injury is not part of the plaintiff's ordinary business risk." (24 Cal.3d at p. 808.) (This is referred to herein as the three-part formulation.)

Subsequent cases have applied the *J'Aire* six-part test in deciding whether a special relationship existed between the parties—i.e., whether a duty of care existed. The reported cases generally find (or do not, as the case may be) a special relationship based primarily on the first four *J'Aire* factors. As applied in the cases, these factors essentially help identify whether there is an unusual degree of foreseeability of the particular injury the plaintiff has suffered.

For example, in one of the earliest cases to apply *J'Aire*, this court found a special relationship based upon foreseeability. (*Chameleon Engineering*

*Corp.* v. *Air Dynamics, Inc.* (1980) 101 Cal.App.3d 418, 422-423 [161 Cal.Rptr. 463].) That case involved an appeal from dismissal of a cross-complaint after a demurrer was sustained. The cross-complaint alleged that a parts supplier under contract to provide materials to a general contractor's subcontractor, knew its failure to timely supply parts would preclude timely completion of the overall project. The general contractor alleged that as a result of the supplier's negligent failure to timely perform its contract with the subcontractor, the general contractor was assessed penalties by the project owner under a liquidated damages clause.

As this court read the cross-complaint, the supplier's contract was "intended to and did directly affect" the general contractor; the supplier reasonably could have foreseen the injury to the general contractor if the supplier did not timely perform; and, as a direct result of supplier's negligence, the general contractor clearly was injured in a manner directly related to the negligence. (*Chameleon Engineering Corp.* v. *Air Dynamics, Inc., supra*, 101 Cal.App.3d at p. 423.) The court found the supplier's conduct was not morally blameworthy, and that future harm would be avoided by applying the general requirement that all persons use due care in their undertakings. The court concluded the supplier owed the general contractor a duty of care.

Similarly, in *Earp* v. *Nobmann* (1981) 122 Cal.App.3d 270, 289 [175 Cal.Rptr. 767], and *passim*, disapproved on another ground in *Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 219 [266 Cal.Rptr. 638, 786 P.2d 365], a real estate broker was found liable to the owner of property for the broker's negligent interference with the owner's efforts to sell the property to a buyer other than the broker's client. Applying the six-part test from *J'Aire*, the *Earp* court concluded without difficulty that the broker's actions were intended to affect the property owner, that harm was foreseeable as a result of the broker's negligence, and that the owner clearly had suffered economic injury. (122 Cal.App.3d at p. 291.) In terms of the fourth *J'Aire* factor, the nexus between the injury and the defendant's conduct, the court found: "It is quite probable that had [the broker] at any time concerned himself with the rights of the others . . . rather than pursuing without pause his own personal profit the matter could have been resolved . . . and the injury . . . avoided or minimized." (*Id.* at p. 292.) Finally, the court found that the broker's position of trust in the matter satisfied the moral blame and future harm factors from *J'Aire*. The court found the broker owed a duty of care to the landowner.

In *Worldvision Enterprises, Inc.* v. *American Broadcasting Companies, Inc.* (1983) 142 Cal.App.3d 589 [191 Cal.Rptr. 148], an officer of American Broadcasting Companies (ABC) criticized the level of violence in a television show that was currently showing on ABC, but for which plaintiff held

the residual syndication rights. Noting that the speech was to ABC's affiliate stations and concerned a current ABC broadcast product, the court concluded the first *J'Aire* criterion was not met: the negligent "transaction" (the speech) was not intended to affect plaintiff. The court conceded the injury might have been foreseeable and closely connected with the speech, but concluded that the officer was morally blameless in giving the speech and public policy strongly favored the right to give such a speech. (*Id.* at pp. 597-598.) (Television violence was then, as now, a topic of heightened public debate; "self-regulation," then as now, was the industry's answer. (See *id.* at pp. 592-593.)) The court noted that television syndication was essentially a speculative business, and the ebb and flow of popularity of a given program were exactly what made it so. Accordingly, applying the three-part formulation from *J'Aire*, the injury that plaintiff suffered was " 'part of the plaintiff's ordinary business risk,' " and was not compensable. (142 Cal.App.3d at p. 597.)

In *Pisano* v. *American Leasing* (1983) 146 Cal.App.3d 194, 197 [194 Cal.Rptr. 77], the issue was the same narrow one presented in the present case by the trial court's ruling: are economic damages available in a negligence action? The court held they are, quoting the three-part formulation from *J'Aire*. Because of the narrow basis of the trial court's ruling on summary judgment in that case, the *Pisano* court did not reach the issue whether the necessary special relationship between the plaintiff and defendants had been established. Instead, it merely concluded plaintiff could recover economic losses "so long as he is able to prove the necessary business relationship with defendants." (*Ibid.*)

In *Huang* v. *Garner* (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800], the purchasers of an apartment building sued, inter alia, the original developer and general contractor who built the building nine years before plaintiffs purchased it. (*Id.* at p. 411.) Plaintiffs alleged negligent construction based on certain building code violations that came to light when they sought to convert the building to condominiums. Nonsuit was granted as to plaintiffs' claims for economic damages arising from defendant's negligence. (*Id.* at p. 420.) The appellate court reversed, applying the six-part test from *J'Aire*. (157 Cal.App.3d at p. 423.) The court found a developer of an apartment building would intend the construction to affect subsequent purchasers for investment. (*Id.* at p. 424.) Building code defects are foreseeably dangerous. (*Ibid.*) Evidence of repair costs sought as damages demonstrated certainty of injury. Since plaintiffs did not seek damages for lost profits from converting the building to condominiums, the damages were directly related to the construction defects. (*Ibid.*) Finally, the nature of the dangerous failure to comply with building codes justified a finding of moral blameworthiness and

a public policy basis for imposing liability to prevent future harm. (*Ibid.*) The court remanded for a new trial. (*Id.* at p. 425.)

Somewhat out of the ordinary pattern in these cases is *Sacramento Regional Transit Dist.* v. *Grumman Flxible* (1984) 158 Cal.App.3d 289 [204 Cal.Rptr. 736]. The case held, as relevant here, that when the buyer of goods is a knowledgeable merchant in such goods, that buyer is limited to remedies that may arise under the law of sales, including the law of warranty, and is precluded from a negligence action for economic losses standing alone. (*Id.* at pp. 299-300.) We perceive the resolution of the issues in *Sacramento Regional Transit Dist.* to fit well under the standard of the *J'Aire* "ordinary risk of business" limitation, rather than as formulating a new and separate rule: a knowledgeable merchant weighs the expansiveness of warranty coverage as part of the cost of goods, and takes on lesser or greater risk of product defects as part of a business decision to spend more or less for the product. As such, *Sacramento Regional Transit Dist.* does not conflict with *J'Aire.*

*Ales-Peratis Foods Internat., Inc.* v. *American Can Co.* (1985) 164 Cal.App.3d 277 [209 Cal.Rptr. 917] involved a seafood processor who bought from a can distributor a quantity of cans for packing abalone. The cans were defectively manufactured by the defendant, and were supplied by defendant to the distributor with knowledge of their intended use. The court applied the six-part *J'Aire* test in reversing summary judgment for defendant: the contract between defendant and the can distributor was intended to affect plaintiff. Plaintiff's loss of economic opportunity was foreseeable to defendant. The injury was certain and direct. Moral blame and prevention of future harm supported liability because food packing was in issue. (*Id.* at pp. 289-290.)[8] The court concluded that the particular foreseeability of the economic loss distinguished the case from products liability cases in which specific economic losses are largely unforeseeable. (*Id.* at p. 290.)

*Seeley* v. *Seymour, supra,* 190 Cal.App.3d 844, involved a prospective lessee of real property who prepared, signed and caused notarization of a unilateral "Memorandum of Agreement" for lease of the property. He then caused a title insurance company, Safeco, to record the document. Inter alia, the owner of the real estate, Seeley, sued Safeco for damages caused by the recorded memorandum in Seeley's subsequent sale of the property. Concluding that "[i]t is now clear that a defendant can be liable for economic harm inflicted upon a third party with whom he has no direct dealing," the court applied the *J'Aire* six-part test to impose a duty of care upon Safeco. (*Id.* at

---

[8]That is, the public is better served by encouraging the packer's discovery of the defective cans by permitting recovery of economic losses, rather than only permitting recovery by consumers who are made physically ill as a result of the defects.

p. 860.) The court concluded the memorandum was intended to affect Seeley; the memorandum foreseeably would impair his ability to sell the property; and the injury was clear and closely related to recordation of the memorandum. (*Id.* at pp. 860-861.) While Safeco's negligent action was not morally repugnant, the enterprise of the escrow agent has taken on something of a public character, so public policy favored imposition of liability. (*Id.* at p. 861.) The court affirmed the jury's award of damages to Seeley.

*J'Aire* has continued to be cited favorably. (See, e.g., *Augusta* v. *United Service Automobile Assn.* (1993) 13 Cal.App.4th 4, 9-10 [16 Cal.Rptr.2d 400] [spoliation of evidence]; *McKay* v. *State of California* (1992) 8 Cal.App.4th 937, 939-940 [10 Cal.Rptr.2d 771] [lost profits after injury to real property].)

Turning our attention to the present case, we first determine the trial court erred in its reasoning that economic damages are not available in a negligence action involving no property or other injury where contract remedies are also pursued. The cases, beginning with *J'Aire*, are clear and consistent in permitting recovery even when economic injury is the only injury alleged; nor is absence of a contract remedy a requisite.

Second, as exemplified by *Pisano*, privity or the absence of privity is not a controlling factor in *J'Aire*-type cases. In *Pisano*, the parties were a commercial lessor and lessee in direct privity. (*Pisano* v. *American Leasing*, *supra*, 146 Cal.App.3d at p. 196.) Although most of the cases have involved three-way transactions, this appears to be because, in the usual two party dealings and third party beneficiary cases, the plaintiff "can of course sue on the contract itself without resort to any theory of negligence." (Prosser & Keeton on Torts, *op. cit. supra*, at p. 1000.) Thus, in appropriate cases, express and implied warranty theories permit an award for economic losses as consequential damages merely upon a showing the product was defective. (3 Witkin, Summary of Cal. Law (9th ed. 1987) Sales, § 197, pp. 154-155.)

Third, even though *J'Aire* focuses only on foreseeability as the "key component necessary to establish liability" (*J'Aire*, *supra*, 24 Cal.3d at p. 806), subsequent cases apply the full six-part test in determining the presence or absence of a duty of care. In a related context, the Supreme Court itself has cautioned against reliance on foreseeability of injury as a sufficient basis for imposing a duty of care: "It is apparent that reliance on foreseeability of injury alone in finding a duty, and thus a right to recover, is not adequate when the damages sought are for intangible injury." (*Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 664 [257 Cal.Rptr. 865, 771 P.2d 814]; cf. *id.* at p. 687 (dis. opn. of Broussard, J.) [concluding that *J'Aire* appropriately

emphasizes the key role of foreseeability].) This view of the limited role of foreseeability analysis in the context of economic injury was again emphasized in *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 399 [11 Cal.Rptr.2d 51, 834 P.2d 745].)

We note that neither *Thing* nor *Bily* overruled, or even criticized, *J'Aire*, even though in both cases the dissent contended the majority failed to give enough weight to foreseeability *as required by J'Aire*. (*Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th at p. 420, dis. opn. of Kennard, J.; *Thing* v. *La Chusa*, *supra*, 48 Cal.3d at p. 687, dis. opn. of Broussard, J.)

Thus, foreseeability of economic injury is merely one of the six factors to be considered; a narrow focus on *J'Aire*'s foreseeability analysis is wholly at odds with current Supreme Court case law. *J'Aire* cannot be reduced to a simplistic foreseeability standard.

Therefore, we reject plaintiffs' initial analysis that foreseeability establishes their right to sue for economic losses. ("Here, the OTTS' injury to their economic interest . . . was a foreseeable result of Defendants' want of ordinary care. Therefore, the *J'Aire Corp.* test is satisfied . . . .") ▮ We must consider the applicability of all six *J'Aire* factors as we measure the allegations of the complaint.

In their reply brief, plaintiffs do finally acknowledge and apply the six-part *J'Aire* test for duty of care. Their attempt to satisfy *J'Aire* is unconvincing, however. The reply brief states: "(1) ALFA-LAVAL milking equipment was 'intended to affect' the OTTS in that the system was designed for dairymen like the OTTS; (2) it is 'foreseeable' that negligence by defendant regarding the 1970 vacuum system would directly harm the OTTS' milk production; (3) expert testimony and production data established the 'certainty' of the OTTS' injury; (4) ALFA-LAVAL's negligent conduct was 'closely related' to the OTTS' injury in that OTTS' production was directly damaged by the defendant's 1970 vacuum system; (5) ALFA-LAVAL is 'morally blameworthy' in that it took advantage of the long relationship between the parties by breaching the OTTS' trust in ALFA-LAVAL's competent service; (6) the policy of preventing future harm is evident to deter sophisticated sellers from taking advantage of dairymen who do not deal in the specifications of a milking system."

This analysis is erroneous at critical points. First, neither the pleadings nor the evidence suggests the 1970 milking system was "intended to affect" the plaintiffs in any way particular to the plaintiffs, as opposed to all potential purchasers of the equipment. The absence of this foundation precludes a

finding of "special relationship" as required by *J'Aire*: to the extent the milking system was intended to affect the plaintiffs in the same way as all retail buyers, this becomes a traditional products liability or negligence case in which economic damages are not available. (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 18 [45 Cal.Rptr. 17, 403 P.2d 145].)[9]

Second, the injury to plaintiffs was not reasonably foreseeable. The second amended complaint alleges, and plaintiffs' evidence at trial shows, that the decline in milk production intrinsically related to the 1970 system was negligible—i.e., plaintiffs did not notice it for the next 15 years. It was only when the 1970 system was merged with the new generation of solid state technology in 1985 that the defects in the 1970 system produced a noticeable result. Even if the deficiencies of the combined systems were reasonably foreseeable in 1985 when the SST system was to be "piggy-backed" onto part of the 1970 system, it is apparent that those deficiencies were not reasonably foreseeable 15 years earlier.

We need not consider the remaining parts of the *J'Aire* test under the circumstances of this case. Even if all four weighed in favor of finding a duty of care, we would still conclude that no duty existed. If a duty of care to avoid economic injury existed in the circumstances of the present case, every manufacturer would become an insurer, potentially forever, against economic loss from negligent defects in a product used for its intended purpose. *J'Aire* neither requires nor supports such a radical departure from traditional notions of liability.

Plaintiffs contend, without any supporting argument, that the court also erred in precluding economic damages based on defendants' negligence concerning the 1985 system. While the allegations contained in the second amended complaint may have sufficiently stated a *J'Aire* cause of action for the 1985 sale and installation, the unequivocal evidence at trial shows that there was no special relationship between the defendants and plaintiffs at the time of that transaction. Defendants did not recommend the SST system to fill any particular need of plaintiffs, and defendants were not involved in any way in the configuration or installation of that system. Further, in connection with count 1, the jury expressly found that the 1985 system was not

---

[9]Even in terms of intended effect on dairy operations generally, neither the complaint nor the evidence shows that the 1970 system was sold *as a way to increase production*, which is the manner in which plaintiffs say the system failed. Common experience tells us (and the evidence supports the possibility) that new technology often is designed to (1) reduce labor costs in the production of exactly the same amount of product, and (2) to improve the quality of the product to enhance its salability, for example, by increasing the butterfat content of the milk or reducing the somatic cell count.

defective in design or manufacture, so injury from that system is not reasonably foreseeable.[10]

We conclude the court did not prejudicially err in disallowing recovery of economic damages in count 2.

    2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.   *Count 5 Issues**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II.*

### *Alfa-Laval's Appeal*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The order for new trial on count 5 is reversed. The judgment for plaintiffs on counts 5 and 13 is reversed. The trial court shall enter judgment notwithstanding the verdict for defendants on counts 5 and 13. In all other respects, the judgment is affirmed.

Ardaiz, P. J., and Dibiaso, J., concurred.

---

[10]While in some cases the reviewing court might be reluctant to conclude a party cannot prove that which the trial court forbade him from proving, in this case plaintiffs had the incentive and opportunity to prove the existence of the necessary special relationship and foreseeability in connection with counts 1 and 5. (Compare *S. C. Anderson, Inc.* v. *Bank of America* (1994) 24 Cal.App.4th 529, 539-540 [30 Cal.Rptr.2d 286] [appeal from erroneous denial of leave to reopen evidence after motion for nonsuit; insufficient offer of proof precludes remand].)

Evidence adduced on those counts permits us to conclude defendants had no special knowledge concerning plaintiffs' equipment requirements or those of any relevant subclass of dairy operators (such as, those upgrading a 1970 Alfa-Laval milking system). Without this or a similar factual basis, one cannot infer that defendants took action intended to affect plaintiffs, nor that defendants reasonably could foresee any economic injury from malfunctioning equipment above that which *any* dairy would suffer if its milking system were substandard.

*See footnote, *ante* page 1439.