Filed 11/26/24  Brooklyn Restaurants v. Sentinel Insurance Co. CA4/1
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| BROOKLYN RESTAURANTS, INC., | D081132 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2020-00024865-CU-IC-CTL) |
| SENTINEL INSURANCE COMPANY, LTD., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna, and Milan L. Brandon II for Plaintiff and Appellant.

Steptoe & Johnson, Robyn C. Crowther, Melanie Atswei Ayerh; Wiggin and Dana, and Tadhg Dooley for Defendant and Respondent.

After its diner was partially shut down during the COVID-19 pandemic, Brooklyn Restaurants, Inc. (Brooklyn) brought suit against its insurer, Sentinel Insurance Company, Limited (Sentinel), when Sentinel declined a tender under a commercial property insurance policy.  The

superior court granted Sentinel's motion for judgment on the pleadings, finding there was no coverage under the subject policy for Brooklyn's claimed business loss.

On appeal, Brooklyn advanced two primary challenges to the court's ruling. First, it contended that it had pled a direct physical loss under the unique terms of the subject policy. Second, Brooklyn argued that an endorsement specifically addressing damage caused by a virus rendered the policy illusory. In our previous opinion, we agreed with Brooklyn on both points and reversed the judgment in favor of Sentinel. However, the California Supreme Court granted review and transferred the matter back to this court to vacate our opinion and reconsider in light of *John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2024) 16 Cal.5th 1003 (*John's Grill*).

We have complied with our high court's dictate and reconsidered the issues before us consistent with *John's Grill*. In that case, our high court interpreted an almost identical insurance policy offered by Sentinel to another business, who like Brooklyn, operated a restaurant. (See *John's Grill, supra*, 16 Cal.5th at p. 1007.) Moreover, our high court concluded that the same virus related endorsement that is at issue here was not illusory. (*Id*. at pp. 1014−1021.) Because we must follow California Supreme Court precedent (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), we also find that the subject policy is not illusory.[1] Consequently, we affirm the judgment.

---

[1]     Because the subject policy is not illusory and excludes Brooklyn's claim of loss as we explain *post*, we need not address Brooklyn's argument that it alleged a direct physical loss.

## FACTUAL AND PROCEDURAL BACKGROUND

Brooklyn "operates an iconic local diner and longstanding community gathering place known as 'Harry's Coffee Shop'. " Harry's Coffee Shop is located in La Jolla, California, in "a heavily trafficked pedestrian thoroughfare that invites visitors to linger, dine, shop, and socialize." In addition, Harry's Coffee Shop benefits from regional theme parks and other facilities that attract visitors to the area.

In August 2019, Brooklyn renewed its commercial property policy with Sentinel. The policy was a Spectrum Business Owner's Policy No. 72 SBA BB7110 SC (the Policy), which provided coverage for Harry's Coffee Shop from August 1, 2019 to August 1, 2020.

The Policy, consisting of 196 pages, includes provisions Brooklyn argues are relevant here. For example, the Special Property Coverage Form states that Sentinel "will pay for direct physical loss of or physical damages to Covered Property at the premises . . . caused by or resulting from a Covered Cause of Loss." The Policy further defines a "Covered Causes of Loss" as "risks of direct physical loss," except where otherwise excluded or limited.

The Policy also includes an endorsement for "Limited Fungi, Bacteria or Virus Coverage" (the Virus Endorsement). That endorsement contains provisions that (1) add limited coverage in certain circumstances for "loss or damage" "caused by" "virus," subject to certain conditions requiring that the virus was the "result of" one or more of a list of enumerated causes, and (2) exclude any "loss or damage caused directly or indirectly by" the "[p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus," subject to an exception where the loss or damage falls within the limited coverage provided under the Virus Endorsement.

Additionally, the Policy provides Business Income coverage for losses caused by direct physical loss or damage at dependent properties "caused by or resulting from a Covered Cause of Loss." Further, the Policy defines a dependent property as "property owned, leased or operated by others whom [Brooklyn] depend[ed] on to: [¶] (a) Deliver materials or services to [Brooklyn] or to others for [Brooklyn's] account. But services do not include: [¶] (i) Water, communication, power services or any other utility services; or [¶] (ii) Any type of web site, or Internet service. [¶] (b) Accept [Brooklyn's] products or services; [¶] (c) Manufacture [Brooklyn's] products for delivery to [Brooklyn's] customers under contract for sale; or [¶] (d) Attract customers to [Brooklyn's] business premises."

In March 2020, Brooklyn submitted a claim under the Policy "for loss of business income due to the community spread and infection of coronavirus at [Harry's Coffee Shop], and the civil response thereto."[2] Sentinel denied the claim. Brooklyn then filed suit.

In the first amended complaint, Brooklyn alleged that, beginning in March 2020, a series of government stay-at-home orders[3] issued in response to the coronavirus as well as "community infection of COVID-19 adjacent to

---

[2] The actual claim does not appear to be in the record.

[3] These orders included: (1) Executive Order N-45-20 that declared a state of emergency in response to expected impacts arising from the COVID-19 pandemic; (2) Executive Order N-33-20 that ordered all individuals living in California to stay home or at their place of residence subject to certain exceptions; (3) an order from the public health officer of San Diego County wherein all individuals living in San Diego County were to stay at home except that they may leave to provide or receive certain essential services or to engage in certain essential activities; and (4) a reclosure order that closed indoor dining at restaurants for an additional three weeks in July 2020.

[Harry's Coffee Shop], have caused a precipitous decline in [Brooklyn's] business income." Although acknowledging that restaurants and food services were deemed "Essential Critical Infrastructure," exempting them from governmental orders, Brooklyn alleged that, in response to an executive order issued by California's governor, it was "forced to prohibit on-site dining, severely limiting the number of customers that [it] could service and effectuating a disastrous evaporation of [its] business income."

Brooklyn also averred that "[b]eginning in March 2020, local and state governments across the country urged their citizens to act as if they were infected and as if everyone around them was infected with a novel and highly infectious coronavirus." As such, Brooklyn claimed Harry's Coffee Shop was, "and continue[d] to be, repeatedly infected by individuals coming and going from the premises until the virus is eliminated in the region."

Brooklyn further alleged that the United States federal government issued travel bans, prohibiting "foreign nationals" from several countries from entering the United States. It also noted that, "[b]ecause of the presence of COVID-19, which was continually and repeatedly brought to . . . [Harry's Coffee Shop] by employees and guests, [Brooklyn] was forced to reduce operations and move outside, physically losing the use of its interior dining spaces."

In addition, Brooklyn represented that "[i]n or about the early weeks of March 2020, the government, scientific community, and those personally affected by the virus recognized the coronavirus as a cause of real physical loss and damage." Moreover, Brooklyn claimed the coronavirus pandemic was "exacerbated by the fact that the deadly coronavirus physically infects and stays on the surfaces of objects or materials for many days. The virus was also carried into this state by individuals traveling between countries

5

and states who in turn infected others and the facilities they visited, infecting property in and around . . . [Harry's Coffee Shop]." (Footnote omitted.)

The operative complaint included allegations regarding the impact of the coronavirus pandemic on Harry's Coffee Shop. To this end, Brooklyn averred that "[t]he presence of COVID-19 also required [Brooklyn] to operate at reduced capacity and deprived [Brooklyn] of the ability to use the dining rooms and other facilities at . . . [Harry's Coffee Shop]. Moreover, the repeated movement of equipment, tables, and other furniture in and out of the building in order to respond to the presence of the virus resulted in physical damage to that equipment, including broken chairs and at least one broken table." And Brooklyn alleged that it was required to incur "significant Extra Expense through enhanced and continual sanitation of . . . [Harry's Coffee Shop] in order to help mitigate the impacts of business interruption and continue operations in some decreased capacity."

The operative complaint contained causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and professional negligence. These causes of action were based on Sentinel's denial of Brooklyn's claim under the Policy.

Sentinel filed a motion for judgment on the pleadings. Brooklyn opposed that motion, to which, Sentinel filed a reply. The superior court granted the motion, finding that there was no coverage under the Policy for Brooklyn's claims. The court subsequently entered judgment in favor of Sentinel, dismissing the operative complaint with prejudice. Brooklyn timely appealed.

6

DISCUSSION

A. Standard of Review and Relevant Law

" 'The standard of review for a motion for judgment on the pleadings is the same as that for a general demurrer: We treat the pleadings as admitting all of the material facts properly pleaded, but not any contentions, deductions or conclusions of fact or law contained therein. . . . We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any theory.' " (*Burd v. Barkley Court Reporters, Inc.* (2017) 17 Cal.App.5th 1037, 1042.) "Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion." (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448.)

This appeal requires us to interpret an insurance policy. "The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see Civ. Code, § 1636.) "If contractual language is clear and explicit, it governs." (*Bank of the West*, at p. 1264; see Civ. Code, § 1638.) If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " (*Bank of the West*, at p. 1265, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer. (*Bank of the West*, at p. 1264.)' (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 501.) The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the

7

policy and received premiums to provide the agreed protection. [Citations.]"
(*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 (*Minkler*).)

"To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer. The insured has the burden of establishing that a claim, unless specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies. [Citations.]" (*Minkler, supra*, 49 Cal.4th at p. 322.)

"The existence of a material ambiguity in the terms of an insurance policy may not, of course, be determined in the abstract, or in isolation. The policy must be examined as a whole, and in context, to determine whether an ambiguity exists. (*MacKinnon* [*v. Truck Ins. Exchange* (2003)] 31 Cal.4th 635, 648; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)" (*Minkler, supra*, 49 Cal.4th at p. 322.)

B. Analysis

Brooklyn bases its claim that the Policy is illusory on the Virus Endorsement. That endorsement begins with exclusions, detailing what Sentinel was not required to pay based on the amendments the endorsement made to the "Increased Cost of Construction Additional Coverage of the Standard Property Coverage Form." In addition, the Virus Endorsement offers other exclusions toward the beginning of the provision (the Virus Exclusion):

"i. 'Fungi', Wet Rot, Dry Rot, Bacteria And Virus

"We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is

8

excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

"(1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus.

"(2) But if 'fungi', wet rot, dry rot, bacteria or virus results in a 'specified cause of loss' to Covered Property, we will pay for the loss or damage caused by that 'specified cause of loss'."

However, the above exclusion includes a carve out for certain specified causes as follows:

"This exclusion does not apply:

"(1) When 'fungi', wet or dry rot, bacteria or virus results from fire or lightning; or

"(2) To the extent that coverage is provided in the Additional Coverage – Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning.

"This Exclusion applies whether or not the loss event results in widespread damage or affects a substantial area."

Further, the Virus Endorsement specifically adds language to the "Additional Coverage" provision of the Special Property Coverage Form. It provides coverage as follows:

"The coverage . . . only applies when the 'fungi', wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

"(1) A 'specified cause of loss' other than fire or lightning;

"(2) Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises."

9

"b. We will pay for loss or damage by 'fungi', wet rot, dry rot, bacteria and virus. As used in this Limited Coverage, the term loss or damages means:

"(1) Direct physical loss or direct physical damage to Covered Property caused by 'fungi', wet rot, dry rot, bacteria or virus, including the cost of removal of the 'fungi', wet rot, dry rot, bacteria or virus;

"(2) The cost to tear out and replace any part of the building or other property as needed to gain access to the 'fungi', wet rot, dry rot, bacteria or virus; and

"(3) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that 'fungi', wet rot, dry rot, bacteria or virus are present."

The Virus Endorsement does not include a definition of "Specified Cause of Loss." Nonetheless, elsewhere in the Policy, that phrase is defined as follows: " 'Specified Cause of Loss' means the following: Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." The parties do not argue that there existed other specified causes of loss under the Policy. Further, there are no allegations in the operative complaint that any of the specified causes of loss triggering coverage under the Virus Endorsement exist. In other words, if the Virus Endorsement is not illusory, Brooklyn's claim of loss is not covered under the Policy.

In *John's Grill, supra*, 16 Cal.5th 1003, our high court interpreted an almost identical policy to the one at issue here and specifically addressed

10

whether the Virus Endorsement was illusory.  In determining that it was not (see *id*. at pp. 1014-1021), the court succinctly explained:

> "In sum, under the circumstances here, John's Grill cannot invoke the illusory coverage doctrine to transform the policy's *limited* virus-related coverage into *unlimited* virus-related coverage. The policy's limitations on coverage were explicit and unambiguous. Absent some extraordinary circumstance, courts must enforce such explicit and unambiguous policy limitations. John's Grill has not shown any such extraordinary circumstances exist here." (*Id*. at p. 1022.)

Because our Supreme Court has concluded that the very same Virus Endorsement we interpret here is not illusory, we follow that decision.  (See *Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.)

Although we follow *John's Grill* and find that the Virus Endorsement is not illusory, we must now address an argument that our high court did not tackle—Brooklyn's claim the Virus Endorsement cannot be enforced because it is not sufficiently conspicuous, plain, or clear.

Here, the Virus Exclusion is "placed and printed so that it will attract the reader's attention." (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204.)  The Virus Exclusion is the first part of the Virus Endorsement. At the top of the Virus Endorsement, in bold type, the heading states, "**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**"  The heading, in turn, is followed by the title of the endorsement (also printed in bold, in all caps):  "**LIMITED FUNGI, BACTERIA OR VIRUS COVERAGE**."  The very first provision of the Virus Endorsement is Section A, which clearly states in bold letters:  "**Fungi, Bacteria or Virus Exclusions**."  Therefore, any reasonable person would be on notice that the Virus Endorsement contains certain exclusions, which will impact coverage.  Indeed, those exclusions are the first thing one would read

11

when reviewing the Virus Endorsement.  As such, the Virus Exclusion "is conspicuous, plain, and clear, and therefore enforceable." (*Rencana LLC v. Sentinel Ins. Co.* (D. Conn. 2022) 604 F.Supp.3d 34, 42 [applying California law].)

## DISPOSITION

The judgment is affirmed.  Sentinel is entitled to its costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

DATO, J.

CASTILLO, J.