Filed 5/30/23  Showa Hospitality v. Sentinel Insurance Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SHOWA HOSPITALITY, LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> SENTINEL INSURANCE COMPANY, LIMITED, <br><br> Defendant and Respondent. | D080008 <br><br><br> (Super. Ct. No. 37-2020-00018311-CU-IC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Affirmed.

LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna, and Milan L. Brandon II, for Plaintiffs and Appellants.

Steptoe & Johnson, Robyn C. Crowther, Sarah D. Gordon; Wiggin and Dana, Tadhg Dooley, and Jonathan M. Freiman, for Defendant and Respondent.

As with many businesses that suffered losses during the COVID-19 pandemic, Showa Hospitality, LLC and The Taco Stand Orange Corp. (together, Showa) brought suit against their insurer, Sentinel Insurance

Company, Limited (Sentinel), after Sentinel declined a tender under a commercial property insurance policy. The superior court granted Sentinel's motion for judgment on the pleadings, finding there was no coverage under the subject policy for Showa's claimed business loss.

Showa appeals the ensuing judgment of dismissal, arguing this case is different from the dozens that have preceded this one. To this end, Showa points out that it has alleged a direct physical loss, which triggers coverage under the policy. Moreover, it emphasizes that the subject insurance policy contains a unique provision, specifically covering losses attributable to a virus. We reject these contentions. Showa's allegations of direct physical loss are mere legal conclusions and not based on any alleged facts. Further, the allegations in the operative complaint as well as Showa's arguments in its briefs make clear that the causes of Showa's business losses here are not attributable to the presence of the COVID-19 virus on the insured premises, but instead, the losses are the alleged result of certain government orders, community infection, and the assumption that the virus is ubiquitous. Because Showa cannot satisfy the threshold requirements to make a viable claim that there is coverage under the subject policy, we conclude the superior court did not err in granting Sentinel's motion for judgment on the pleadings. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Showa operates a fast food casual Mexican restaurant (the Restaurant), offering both dine-in and take-out facilities with both indoor and outdoor dining areas. The Restaurant is located in downtown Orange, California, close to Disneyland, Knotts' Berry Farm, malls, and multiple state beaches.

In early 2020, Showa purchased a commercial property policy from Sentinel. The policy was a Spectrum Business Owner's Policy No. 72 SBA BC2838 (the Policy), which provided coverage for the Restaurant from March 4, 2020 to March 4, 2021.

The Policy, consisting of 110 pages, included provisions Showa argues are relevant here. For example, under the property coverage declarations, the Policy included coverage under a "Business Income" provision, which obligated Sentinel to "pay for the actual loss of [b]usiness [i]ncome [Showa] sustain[ed] due to the necessary suspension of 'operations' " during a "period of restoration" "caused by direct physical loss of or physical damaged to" the insured property.

The Policy also included an "Extra Expense" provision that required Sentinel to "pay reasonable and necessary" expenses Showa incurred during a " 'period of restoration' " that it "would not have incurred had there been no direct physical loss or physical damaged to the property." The Policy defined "Period of Restoration" as "the period of time" that "begins with the date of direct physical loss or physical damage" and ends when the property should be "repaired, rebuilt or replaced" or the "business is resumed at a new, permanent location."

In addition, the "Special Property Coverage Form" provided that Sentinel "will pay for direct physical loss of or physical damage" to the insured property "caused by or resulting from a Covered Cause of Loss." The Policy goes on to define "Covered Causes of Loss" as "risks of direct physical loss," except where otherwise excluded or limited.

The Policy also included an endorsement for "Limited Fungi, Bacteria, or Virus Coverage." That endorsement contained provisions that (1) added limited coverage in certain circumstances for "loss or damage" "caused by"

3

"virus" (the Limited Virus Coverage), subject to certain conditions requiring that the virus was the "result of" one or more of a list of enumerated causes, and (2) excluded any "loss or damage caused directly or indirectly by" the "[p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus" (the Virus Exclusion), subject to an exception where the loss or damage fell within the Limited Virus Coverage.

Additionally, the Policy provided Business Income Coverage for losses caused by physical loss or damage at dependent properties "caused by or resulting from a Covered Cause of Loss." Further, the Policy defined a dependent property as "property owned, leased or operated by others whom [Showa] depend[ed] on to: [¶] (a) Deliver materials or services to [Showa] or to others for [Showa's] account. But services do not include: [¶] (i) Water, communication, power services or any other utility services; or [¶] (ii) Any type of web site, or Internet service. [¶] (b) Accept [Showa's] products or services; [¶] (c) Manufacture [Showa's] products for delivery to [Showa's] customers under contract for sale; or [¶] (d) Attract customers for [Showa's] business premises."

On or about March 23, 2020, Showa submitted a claim under the Policy, seeking coverage for "loss of business income due to the community spread and infection of coronavirus at the Insured Properties, and the civil response thereto."[1] Sentinel denied the claim. Showa then filed suit.

In the operative complaint, the first amended complaint, Showa alleged that, in March 2020, a series of government stay-at-home orders issued in response to the coronavirus "severely impacted commercial enterprises, including restaurants in Orange, California." Although acknowledging that restaurants and food services were deemed "Essential Critical

---

[1] The actual claim does not appear to be in the record.

4

Infrastructure," exempting them from governmental orders, Showa alleged that, in response to an executive order issued by California's governor, it was "forced to prohibit on-site dining, severely limiting the number of customers that [it] could service and effectuating a disastrous evaporation of [its] business income."

Showa also averred that "[b]eginning in March 2020, local and state governments across the country urged their citizens to act as if they were infected and as if everyone around them was infected with a novel and highly infectious coronavirus." As such, Showa claimed its properties "are, and continue to be, repeatedly infected by individuals coming and going from the premises until the virus is eliminated in the region."

Showa further alleged that the United States federal government issued travel bans, prohibiting "foreign nationals" from several countries from entering the United States. It also noted that, per a local order from the Orange County Health Officer, restaurants were only permitted to remain open for delivery or carry out.

In addition, Showa represented that "[i]n or about the early weeks of March 2020, the government, scientific community, and those personally affected by the virus recognized the coronavirus as a cause of real physical loss and damage." Moreover, Showa claimed the coronavirus pandemic was "exacerbated by the fact that the deadly coronavirus physically infects and stays on the surfaces of objects or materials for many days. The virus was also carried [into] this state by individuals traveling between countries and states who in turn infected others and the facilities they visited, infecting property in and around the Insured Properties." (Footnote omitted.) Showa alleged that the government closure orders as well as community infection in Orange County caused Disneyland, Knott's Berry Farm, nearby malls, state

5

beaches, and other business located near Shona's restaurant to close down. These events "caused a precipitous decline in business income."

The operative complaint contained causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and professional negligence. These causes of action were based on Sentinel's denial of Showa's claim under the Policy.

Sentinel filed a motion for judgment on the pleadings.[2] Showa opposed that motion. The superior court granted the motion, finding that there was no coverage under the Policy for Showa's claims. The court subsequently entered a judgment in favor of Sentinel, dismissing the operative complaint with prejudice. Showa timely appealed.

In addition to the typical briefing in an appellate matter, we allowed Sentinel to file a supplemental respondent's brief to address three cases Showa cited in the reply brief, all of which were issued after Sentinel filed its original respondent's brief. Also, we permitted the parties to file supplemental briefs to address the impact, if any, of the recently decided case *John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2022) 86 Cal.App.5th 1195, review granted March 29, 2023, S278481 (*John's Grill*).

DISCUSSION

A. Standard of Review and Relevant Law

" 'The standard of review for a motion for judgment on the pleadings is the same as that for a general demurrer: We treat the pleadings as admitting all of the material facts properly pleaded, but not any contentions, deductions or conclusions of fact or law contained therein. . . . We review the complaint de novo to determine whether it alleges facts sufficient to state a

---

[2] Sentinel's motion for judgment on the pleadings is not included in the record.

6

cause of action under any theory.' " (*Burd v. Barkley Court Reporters, Inc.* (2017) 17 Cal.App.5th 1037, 1042.)  "Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion." (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448.)

This appeal requires us to interpret an insurance policy.  "The principles governing the interpretation of insurance policies in California are well settled.  'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions.  (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see Civ. Code, § 1636.) "If contractual language is clear and explicit, it governs."  (*Bank of the West*, at p. 1264; see Civ. Code, § 1638.)  If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' "  (*Bank of the West*, at p. 1265, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.)  Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer.  (*Bank of the We*st, at p. 1264.)'  (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 501.)  The 'tie-breaker' rule of construction against the insurer stems from the recognition that the insurer generally drafted the policy and received premiums to provide the agreed protection.  [Citations.]" (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 (*Minkler*).)

"To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection, but clauses setting forth specific exclusions from coverage are interpreted narrowly against the insurer.  The insured has the burden of establishing that a claim, unless

specifically excluded, is within basic coverage, while the insurer has the burden of establishing that a specific exclusion applies. [Citations.]" (*Minkler*, *supra*, 49 Cal.4th at p. 322.)

"The existence of a material ambiguity in the terms of an insurance policy may not, of course, be determined in the abstract, or in isolation. The policy must be examined as a whole, and in context, to determine whether an ambiguity exists. (*MacKinnon* [*v. Truck Ins. Exchange* (2003)] 31 Cal.4th 635, 648 [(*MacKinnon*)]; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)" (*Minkler*, *supra*, 49 Cal.4th at p. 322.)

B. Analysis

Here, the Policy includes a Special Property Coverage Form that states that Sentinel "will pay for direct physical loss of or physical damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss." The Policy provides additional coverages that supplement this basic grant of first party coverage, including under the Business Income and Extra Expense provisions. When applicable, the Business Income and Extra Expense provisions cover Showa's "actual loss of Business Income" incurred due to a suspension of operations during the " 'period of restoration,' " provided that the suspension was caused by "direct physical loss of or physical damage to" covered property, "caused by or resulting from a Covered Cause of Loss," together with "reasonable and necessary Extra Expense" incurred during the " 'period of restoration' " that Showa "would not have incurred if there had been no direct physical loss or physical damage to property" at the insured premises. Thus, the grant of business interruption coverage in the Business Income and Extra Expense provisions parallels the main grant of first party coverage by requiring "physical" impairment and by contemplating a "period of restoration" of physically impaired property.

8

In light of these provisions (and an additional endorsement discussed *post*), Showa frames the question to be decided by this appeal as follows: "The ultimate question presented here is whether Showa's loss of property owned, leased, or used by Showa itself or its dependent property customers, because of unsafe conditions created by COVID-19 infection in and around the facilities, is either a 'damage to property' or a 'loss of property' under the Policy." To the extent Showa asks us to address this question under the Policy regarding the Special Property Coverage Form as well as the Business Income and Extra Expense provisions discussed *ante*, we note that several California courts have found no coverage under similar policies. (See, e.g., *Apple Annie, LLC v. Oregon Mutual Ins. Co.* (2022) 82 Cal.App.5th 919, 928-935 (*Apple Annie*); *United Talent Agency v. Vigilant Ins. Co.* (2022) 77 Cal.App.5th 821, 834 (*United Talent*); *Musso & Frank Grill Co., Inc. v. Mitsui Sumitomo Ins. USA Inc.* (2022) 77 Cal.App.5th 753, 760-761 (*Musso*); *Inns-by-the-Sea v. California Mutual Ins. Co.* (2021) 71 Cal.App.5th 688, 700-701 (*Inns*).)

Like the instant matter, *Musso* concerned a restaurant that suffered business losses due to various pandemic related orders. (*Musso, supra*, 77 Cal.App.5th at p. 755.) The restaurant "had a business interruption insurance policy" and filed a claim, "which was denied on the grounds that the policy covered only 'direct physical loss of or damage to' the property." (*Ibid*.) The restaurant sued its insurance company for breach of contract and breach of the implied covenant of good faith and fair dealing. The insurance company demurred arguing "there was no property loss or damage," and the trial court sustained the demurrer without leave to amend. (*Id*. at p. 756.)

On appeal, the issue was "whether the insuring clause's requirement of 'direct physical loss of or damage to [the insured] property' can reasonably be

construed to cover the closure resulting from the pandemic." (*Musso, supra,* 77 Cal.App.5th at p. 757.) The appellate court explained, "[T]he policy required direct ' "physical loss" ' or ' "physical damage" ' to trigger the business interruption policy. [Citation.] 'Accordingly, there must be some physicality to the loss or damage of property—e.g., a physical alteration, physical contamination, or physical destruction.' " (*Id.* at pp. 758-759.) Restating its point, the court wrote, "California law is clear. Physical loss and damage must have [a] material existence." (*Id.* at p. 760.) The appellate court concluded, "At this point, there is no real dispute. Under California law, a business interruption policy that covers physical loss and damages does not provide coverage for losses incurred by reason of the COVID-19 pandemic." (*Ibid.*)

*Musso* largely echoed what this court determined in *Inns, supra,* 71 Cal.App.5th 688. There, we concluded a complaint did not trigger coverage under a commercial property insurance policy for lost business income due to the COVID-19 pandemic where the insured alleged that "COVID-19 strains physically infect and can stay alive on surfaces for extended periods" and that county closure orders required the insured to cease operations. (*Id.* at pp. 692, 693-694.) We observed:[3]

> " '[T]he presence of COVID-19 on Plaintiff's property did not cause damage to the property necessitating rehabilitation or restoration efforts similar to those

---

[3]    We also noted "hundreds of merit-based rulings have been issued in both state and federal courts," and summarized: "The overwhelming majority of federal district court cases find no possibility of coverage under commercial property insurance policies for a business's pandemic-related loss of income [citations], along with each federal appellate court to consider the issue [citations], including the Ninth Circuit applying California law (*Mudpie, Inc. v. Travelers Casualty Ins. Co. of America* (9th Cir. 2021) 15 F.4th 885 [*Mudpie*].)" (*Inns, supra,* 71 Cal.App.5th at p. 692, fn. 1.)

required to abate asbestos or remove poisonous fumes which permeate property. Instead, all that is required for Plaintiff to return to full working order is for the [government orders and restrictions to be lifted].' [Citation.] 'This case . . . concerns an invisible virus that is present throughout the world. . . . It is that general presence, and not a specific physical harm to covered properties, that has caused governments at all levels to consider restrictions. The question, therefore, is one of "widespread economic loss due to restrictions on human activities, not the consequence of a direct physical loss or damage to the insured premises." ' " (*Id.* at p. 704 (footnotes omitted).)

*Musso* and its ilk reinforce our conclusion in *Inns* because "[i]t is now widely established that temporary loss of use of a property due to pandemic-related closure orders, without more, does not constitute direct physical loss or damage." (*United Talent*, *supra*, 77 Cal.App.5th at pp. 830-831.) Thus, we continue to find that the phrase "direct physical loss of or damage to property" requires some negative occurrence to befall the physical aspect of the property; the phrase does not encompass a temporary restriction on using property that is physically intact and still in the physical possession of the insured. (See *Musso, supra*, 77 Cal.App.5th at p. 760; *Inns, supra*, 71 Cal.App.5th at pp. 705-708; *United Talent*, at p. 834; *Apple Annie, supra*, 82 Cal.App.5th at p. 934.)

11

Showa maintains that we should disregard the multitude of cases undercutting its position here.[4] Accordingly, it asserts (1) this court acknowledged in a hypothetical in *Inns* "that case law supports the assertion that certain invisible substances may cause direct physical loss or damage" and (2) we should follow *Marina Pacific Hotel and Suites, LLC v. Fireman's Fund Insurance Company* (2022) 81 Cal.App.5th 96 (*Marina Pacific*). We address these two points in turn.

In *Inns, supra,* 71 Cal.App.5th at page 699, footnote 12, we observed:

> "This litigation does not involve a scenario in which a business has alleged it was the target of an order requiring its particular premises to close for a period of time due to the demonstrated presence of a person infected with the COVID-19 virus. For example, such an order hypothetically might be issued to allow a particular business to undertake disinfection procedures or to allow time for the virus to dissipate. Inns has not suggested that it could amend its complaint to add any such allegations. We do not decide whether commercial property insurance coverage might be triggered in such a circumstance."

Here, Showa claims it has alleged, "under the precedent established by this [c]ourt, Showa *did* suffer direct physical loss or damage because of COVID-19 that gave rise to a suspension, as defined under the Policy, that resulted in lost business income." Tellingly, Showa does not cite to any

[4] Showa argues that these cases improperly relied upon and misinterpreted *MRI Healthcare Center of Glendale, Inc. v. State Farm General Insurance Company* (2010) 187 Cal.App.4th 766 and federal cases like *Mudpie, supra,* 15 Fed.4th 885. To agree with Showa here would require us to ignore or overrule *Inns, supra,* 71 Cal.App.5th 688. We have recently followed *Inns* as good law. (See *Best Rest Motel, Inc. v. Sequoia Ins. Co.* (2023) 88 Cal.App.5th 696, 703-705.) We thus decline Showa's invitation to revisit the issue we resolved, consistent with the majority approach under California law, in *Inns*.

portion of the operative complaint that supports its argument. Our review of that complaint did not uncover any such allegations either. The allegations in the first amended complaint regarding the presence of COVID-19 at Showa's restaurant are exceedingly vague. There are no allegations regarding the extent of the alleged COVID-19 infiltration at the Restaurant. For example, Showa does not allege that the COVID-19 virus was pervasive at the Restaurant in that it was found on particular surfaces, in the kitchen, or on tables, chairs, countertops, floors, bathrooms, cookware, or desks. There are no allegations that the Restaurant was shut down for a period of time because the COVID-19 virus was found at the premises or a worker was infected and came to work. And the operative complaint does not contain any allegations regarding any acts taken to mitigate the risk of the virus or clean, repair, or test for the virus. Rather, the first amended complaint described the situation as follows: "Beginning in March 2020, local and state governments across the country urged citizens to act as if they were infected and as if everyone around them was infected with a novel and highly infectious coronavirus. Under such a guideline, the Insured Properties are, and continue to be, repeatedly infected by individuals coming and going from the premises until the virus is eliminated in the region." Therefore, Showa alleged that people were told to assume they were infected and everyone around them was infected. Based on this assumption, Showa baldly concluded that its restaurant was repeatedly infected until the virus was eliminated (not at the Restaurant, but in the community). As such, there were no allegations that the Restaurant was closed because of the presence of the COVID-19 virus on its premises or that an order specifically targeted the Restaurant, requiring it to close while it was disinfected, repaired, or moved. To the contrary, the allegations in the instant action mirror those we found

13

lacking in *Inns*. It was not the presence of the virus in the Restaurant that caused it to close to onsite dining, but the presence of the virus throughout Orange County and California. (See *Inns*, *supra*, 71 Cal.App.5th at p. 699.) Consequently, our hypothetical in *Inns* does not aid Showa here.[5]

In addition to finding *Inns* unhelpful to Showa's arguments here, we similarly are not persuaded that *Marina Pacific*, *supra*, 81 Cal.App.5th 96 should change our analysis. In that case, the insureds alleged that the COVID-19 virus "not only lives on the surfaces but also bonds to surfaces through physiochemical reactions involving cells and surface proteins, which transforms the physical condition of the property." They further averred that the virus was present on the surfaces throughout the insured properties (hotel and restaurant) including the hotel lobby, kitchens, employee breakroom, service elevator, parking garage, bedding, fixtures, tables, chairs, and countertops. The insureds claimed that they were required to close or suspend operations in whole or in part at various times and incurred extra expense as they adopted measures to restore and remediate the air and surfaces at the insured properties. (*Id.* at pp. 108-109.) The court also noted that "[t]he insureds specifically alleged they were required to 'dispose of property damaged by COVID-19 and limit operations at the Insured Properties.' " (*Id.* at p. 109.)

The appellate court, which was considering a judgment of dismissal following a successful demurrer, noted that it must assume the truth of the

---

[5]     Showa's failure to specifically allege the extent of the presence of the COVID-19 virus at the Restaurant is understandable. After all, despite the prohibition regarding onsite dining, the Restaurant remained open for takeout and delivery. It certainly would raise questions if Showa continued to serve the public if the COVID-19 virus was prevalent throughout the Restaurant.

allegations, "even if improbable," and concluded "the insureds ha[d] unquestionably pleaded direct physical loss or damage to covered property." (*Marina Pacific*, *supra*, 81 Cal.App.5th at p. 109.) As such, the court reversed the judgment of dismissal but "recognize[d] this conclusion is at odds with almost all (but not all) decisions considering whether business losses from the pandemic are covered by the business owners' first person commercial property insurance." (*Ibid*.)

Showa maintains that, like the insureds in *Marina Pacific*, it sufficiently alleged it suffered a physical loss or damage at the Restaurant. To this end, Showa points to the following allegations in the operative complaint: "As a result of the pandemic, physical damage at the Insured Location, the subsequent response of state and local authorities, and the closure of local tourist-oriented business, [Showa] ha[s] incurred, and continue[s] to incur, a substantial loss of business income and additional expenses covered under the Policy."[6] But these allegations are mere legal

_____

[6]  Elsewhere in the operative complaint, Showa alleged it "suffered direct physical loss or damage to its Insured Location. This damage was in the form of loss of use resulting from repeated and continuous community and property infection of coronavirus." In addition, the complaint includes a footnote stating: "Experts have found that coronavirus fomites (infectious pathogens) linger on plastic and stainless steel services 'for up to 72 hours.' [Citation.] Because courts have interpreted 'direct physical loss' and similar provisions in insurance contracts to include coverage for loss of use of tangible property that is not otherwise physically injured, such prolonged infection, which necessitates the loss of use of the subject property, thus renders any physical loss inflicted by the virus direct and tangible. [Citation.]" And Showa also alleged, "[t]he deadly coronavirus in fact can remain alive and is transmittable on surfaces and physical property for a prolonged period measured by days or even weeks." Yet, Showa does not discuss or refer to these allegations or explain how they might support its argument that its claims are covered under the Policy. The burden is not on us "to search the record to ascertain whether it contains support for [Showa's]

conclusions.  At the pleading stage, a court does not "assume the truth of contentions, deductions, or conclusions of fact or law." (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.)  Thus, these allegations are not helpful to Showa here.  Further, the allegations stand in stark contrast to the detailed allegations that the court found sufficient in *Marina Pacific*.  And Showa has not indicated that it can make similar, detailed allegations.

Showa also asserts that it alleged similar physical loss or damages at the dependent properties as well.  As such, Showa relies on paragraph numbers 33, 39, and 43 in the first amended complaint.[7]  Nonetheless, there are no allegations of physical loss or damages at the dependent property in those paragraphs.  Thus, those paragraphs do not aid Showa's cause.[8]

contentions," or to " 'furnish a legal argument as to how the trial court's rulings' " are incorrect.  (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546.)  "It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness."  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)  Because Showa does not discuss these allegations on appeal, we discern that they are not germane to its arguments here.

[7]    Showa specifically refers to paragraph 33 on page 172 of the clerk's transcript, paragraph 43 on page 176 of the clerk's transcript, and paragraph 39 on page 178 of the clerk's transcript.  Paragraph 39 is found on page 174.  However, we also reviewed all of page 178 in case Showa inadvertently referred to the wrong paragraph in its opening brief.  We did see the following allegations on that page: "The virus is physically impacting public and private properties in cities around the world, the United States, and the County of Orange."  Nonetheless, those allegations fall far short of alleging any facts that the dependent properties had suffered physical loss or damage from the COVID-19 virus.

[8]    In its reply brief, Showa argues it should be granted leave to allege additional facts about the actual presence of the COVID-19 virus at the dependent properties.  Such allegations would not satisfy the requirement of

16

Indeed, the allegations on which Showa relies here underscore the stark contrast between the allegations the insureds made in *Marina Pacific* and the bare legal conclusions Showa offers in the first amended complaint. Moreover, Showa has made no representations that it can adequately allege physical loss or damage at the Restaurant. It simply claims it has sufficiently alleged physical loss or damage at the insured property without clarifying what such physical loss or damage actually is. As such, even if we were to follow *Marina Pacific*, Showa has not shown that case supports reversal of the judgment here.[9]

Showa also attempts to distinguish the instant matter from *Inns*, *Musso*, and their progeny based on the argument the Policy is different than the insurance policies previous courts have considered. Therefore, it points us to the endorsement entitled, "Limited Fungi, Bacteria or Virus Coverage" (Virus Endorsement). We agree that if there is coverage to be found for Showa's claims under the Policy then that endorsement is the only provision in the Policy that might provide it.

The Virus Endorsement actually begins with exclusions, detailing what Sentinel was not required to pay based on the amendments the endorsement made to the "Increased Cost of Construction Additional Coverage of the

---

alleging physical loss or damage at those properties. (See *Musso, supra*, 77 Cal.App.5th at p. 760; *Inns, supra*, 71 Cal.App.5th at pp. 705-708; *United Talent, supra*, 77 Cal.App.5th at p. 834; *Apple Annie, supra*, 82 Cal.App.5th at p. 934.)

[9] We do not follow *Marina Pacific, supra*, 81 Cal.App.5th 96. Instead, we continue to follow the majority approach in California that "temporary loss of *use* of a property due to pandemic-related closure orders, without more, does not constitute direct physical loss or damage." (*United Talent, supra*, 77 Cal.App.5th at p. 831.)

Standard Property Coverage Form." In addition, the Virus Endorsement offered other exclusions toward the beginning of the provision:

"i. 'Fungi', Wet Rot, Dry Rot, Bacteria And Virus

"We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

"(1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus.

"(2) But if 'fungi', wet rot, dry rot, bacteria or virus results in a 'specified cause of loss' to Covered Property, we will pay for the loss or damage caused by that 'specified cause of loss'."

However, the above exclusion included a carve out for certain specified causes as follows:

"This exclusion does not apply:

"(1) When 'fungi', wet or dry rot, bacteria or virus results from fire or lightning; or

"(2) To the extent that coverage is provided in the Additional Coverage – Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus with respect to loss or damage by a cause of loss other than fire or lightning.

"This Exclusion applies whether or not the loss event results in widespread damage or affects a substantial area."

Further, the Virus Endorsement specifically added language to the "Additional Coverage" provision of the Special Property Coverage Form (the Limited Virus Coverage). It provided coverage as follows:

"The coverage . . . only applies when the 'fungi', wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve

18

the property from further damage at the time of and after that occurrence.

"(1)  A 'specified cause of loss' other than fire or lightning;

"(2)  Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises."

"b.  We will pay for loss or damage by 'fungi', wet rot, dry rot, bacteria and virus.  As used in this Limited Coverage, the term loss or damages means:

"(1)  Direct physical loss or direct physical damage to Covered Property caused by 'fungi', wet rot, dry rot, bacteria or virus, including the cost of removal of 'fungi', wet rot, dry rot, bacteria or virus;

"(2)  The cost to tear out and replace any part of the building or other property as needed to gain access to the 'fungi', wet rot, dry rot, bacteria or virus; and

"(3)  The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that 'fungi', wet rot, dry rot, bacteria or virus are present."

The Virus Endorsement does not include a definition of "Specified Cause of Loss."  Nonetheless, elsewhere in the Policy, that phrase is defined as follows:  " 'Specified Cause of Loss' means the following:  Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow; ice or sleet; water damage."

Here, although the Virus Endorsement begins with exclusions and the parties spend a great portion of their briefs and supplemental briefs discussing the impact of these exclusions on the coverage issue before us, we begin with analysis of the coverage provided in the Limited Virus Coverage

19

because if Showa's claims are not covered under that provision, we need not consider the endorsement's exclusions. (See *Hallmark Ins. Co. v. Superior Court* (1988) 201 Cal.App.3d 1014, 1017 ["a court must examine the coverage provisions to determine whether a claim falls within the potential ambit of the insurance. [Citations.] Where the scope of the basic coverage itself clearly creates no potential liability under the policy, a court may not give it a 'strained construction' to impose on an insurer a liability the insurer has not assumed"]; *Yahoo, Inc. v. National Union Fire Ins. Co. etc.* (2022) 14 Cal.5th 58, 68 ["When coverage is in dispute, the initial burden is on the insured . . . to prove that its claim falls within the scope of potential coverage. [Citation.] If the insured establishes that the policy provides at least the potential for coverage, the burden shifts to the insurer . . . to show the claim falls within one of the policy's exclusions."].)

As relevant here, the Limited Virus Coverage requires Sentinel to pay, subject to certain exclusions and requirements, "loss or damage" caused by a virus. The Limited Virus Coverage includes a definition for "loss or damage" specific to its coverage provision. To this end, the Limited Virus Coverage provides three subsections to define "the term loss or damage:"

> "(1) Direct physical loss or direct physical damage to Covered Property caused by . . . virus, including the cost of removal of the . . . virus;

> "(2) The cost to tear out and replace any part of the building or other property as needed to gain access to the . . . virus; and

> "(3) The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that . . . virus [is] present."

20

The parties disagree regarding the definition of "loss or damage" in the Limited Virus Coverage. Showa argues that the definition is more expansive than what the courts addressed in *Inns*, *Musso*, and other similar cases in that it specifically includes the cost of removal of a virus as a type of loss or damage. Moreover, Showa argues the Limited Virus Coverage contains no minimum cost threshold or any limitation of the scope of the infection to be removed. Thus, Showa argues that the addition of the language "including the cost of removal" makes clear that such removal constitutes the required "[d]irect physical loss or direct physical damage" to trigger coverage. In other words, as long as a virus was present at the Restaurant and in response to the virus's presence, Showa removed the virus then the cost of that removal constitutes a "loss or damage" under the Policy. Showa further notes that, in *John's Grill*, *supra*, 86 Cal.App.5th 1195, review granted, the First District agreed with its reading of "loss and damage" in the Limited Virus Coverage. There, the court noted:

> "Unlike the undefined phrase 'direct physical loss of or physical damage to' property in the Special Property Coverage Form, the key coverage-triggering phrase in the Limited Virus Coverage grant is simply 'loss or damage,' which is specially defined in a manner that not only contemplates the possibility a virus may 'cause[ ]' physical damage to covered property, but that includes the costs of 'removal' of 'virus'—a phrase capacious enough to include cleaning the surfaces of the property—as well as testing to detect whether virus is merely 'present' on the property."
> (*Id.* at p. 1212, review granted.)

Sentinel disagrees with Showa's reading of the definition of "loss or damage" in the Limited Virus Coverage. It contends that endorsement still required "[d]irect physical loss or direct physical damage" and, if there is such loss or damage, Sentinel would provide coverage for that loss, including the cost of removal. Thus, Sentinel reads the subject clause, not as further

21

specifying what could be considered direct physical loss or direct physical damage but as clarifying what Sentinel would pay for if the Restaurant incurred a direct physical loss or direct physical damage caused by a virus. Moreover, Sentinel maintains its reading is consistent with other portions of the Policy, specifically comparing the phrase "[d]irect physical loss or direct physical damage" in the "loss or damage" definition of the Limited Virus Coverage with the Policy's main coverage grant under the Special Property Coverage Form: "We will pay for direct physical loss or physical damage to Covered Property . . . caused by or resulting from a Covered Cause of Loss." Also, we note subparagraph B.1.b(3) of the Limited Virus Coverage explicitly assumed the property has been damaged further and covered the cost of testing after the damaged property is removed, repaired, replaced, or restored.

Yet, to decide the issue before us, we need not resolve this dispute between the parties. Even if we were to agree with our colleagues in the First District and adopt a more expansive reading of "loss or damage" in the Limited Virus Coverage, we nonetheless would find, under the unique facts of this case, that Showa has not sufficiently pled in the first amended complaint that it was entitled to coverage.

As we discussed *ante*, Showa's allegations in the first amended complaint of physical damage to the Restaurant are mere legal conclusions. Further, Showa has not pointed to any allegations in the operative complaint where it avers that it removed the virus in any way. Indeed, it does not appear that Showa ever argued below, despite the language of the Limited Virus Coverage on which it now relies, that it satisfied "the loss or damage" requirement to trigger that coverage simply by removing the virus. Rather, Showa appears to have argued that it had sufficiently alleged damage to the

22

Restaurant to warrant coverage under the Policy, the Virus Exclusion was unenforceable because it was not conspicuous, plain, or clear, and application of the Virus Exclusion would render the Policy illusory.

In addition, despite submitting a supplemental brief regarding *John's Grill, supra,* 86 Cal.App.5th 1195, review granted, Showa again did not point to any allegations in the first amended complaint that would have comprised "loss or damage" under the Limited Virus Coverage. Even more surprising, however, Showa did not explain how it could plead sufficient facts of such "loss or damage" if given the opportunity to file a second amended complaint notwithstanding the fact that the First District suggested a clear roadmap for doing so. (See *John's Grill, supra,* 86 Cal.App.5th at p. 1215, review granted.) This omission is all the more curious because, surely, Showa was engaging in sanitation efforts at the Restaurant if it was continuing to serve food to customers via takeout and delivery. Yet, Showa does not indicate that it could or would add such allegations in a second amended complaint.

The closest Showa comes to discussing the efforts it took to remove the virus can be found in its reply brief. To this end, Showa argues:

> "As pled in Showa's complaint, the virus was ubiquitous. This is especially the case in the context of a restaurant, which necessitated continuous and persistent sanitation protocols in order to restore the restaurant property to a healthy and safe state. The Policy is completely silent on the minimum length of time that the virus had to be present, and even as to proof of testing for the presence of the virus. *Nevertheless, the facts demonstrate that Showa was required to treat the premises as if the virus was continually present. This meant that constant sanitation measures had to be applied in order for the business to stay open, regardless of whether the business' premises were fully usable for onsite dining or, as here, were only partially usable for takeout alone.* Whether positive COVID-19 tests were yielded on the presence or not (a requirement not

23

found in the Policy), the result was the same — constant efforts to repair insured property in order to restore it to a healthy state." (Italics added.)

Although these arguments indicate that Showa was engaged in efforts to remove the virus at the Restaurant, it also is apparent that Showa's labors did not originate based upon the discovery of the COVID-19 virus on the Restaurant's premises. Instead, Showa describes the COVID-19 virus as "ubiquitous" and admits that it "was required to treat the premises as if the virus was continually present." Alternatively stated, it was not the actual presence of the COVID-19 virus at the Restaurant that caused Showa to take steps to remove it. It was the assumption that the virus was everywhere. So, it did not matter whether the virus actually was present in the Restaurant; Showa was going to act like it was.

Showa further underscores the assumption of the presence of the virus as the impetus for engaging in removal activities when arguing it did not have to allege the virus was physically present at dependent properties to trigger coverage under the Policy. As Showa points out, properties like Disneyland and Knott's Berry Farm closed simply because they, too, assumed the virus was present: "These businesses apparently assumed that the virus was present, and therefore completely closed down."

Also, the assumption of the presence of the virus is consistent with the allegations in the first amended complaint wherein Showa alleged "local and state governments . . . urged . . . citizens to act as if they were infected and as if everyone around them was infected with a novel and highly infectious coronavirus." Then based on this "guideline," Showa assumed that the Restaurant was "repeatedly infected by individuals coming and going from the premises until the virus is eliminated in the region." We note that these allegations do not imply or support the argument that Showa could have

24

taken steps to completely remove the virus from the Restaurant and then resume onsite dining, but instead, the virus needed to be eradicated in the surrounding area before the Restaurant would resume full service. Put differently, pursuant to Showa's allegations, it mattered not whether the COVID-19 virus was removed from the Restaurant in order to resume full operations. Rather, the virus needed to be eliminated from the community.[10]

And Showa further alleged that it suffered business income losses, not because of the presence of the COVID-19 virus at the Restaurant but instead, as a result of various government orders (1) prohibiting public and private gatherings outside a single household, (2) closing onsite dining at restaurants, and (3) restricting travel. In addition, Showa attributed its business losses to "community infection" as well. Indeed, Showa explicitly alleged "as a result of the Government Orders and community infection of coronavirus in and around Orange, California, onsite dining at the Insured Location was prohibited." Again, according to Showa's own allegations, the existence of the COVID-19 virus at the Restaurant did not cause it to cease onsite dining.

---

[10] In this sense, it is difficult to contemplate how Showa could be compensated under the Business Income provision of the Policy. That provision pays for the actual loss of Business Income the insured sustains for suspension of operations during a period of restoration. The period of restoration "begins with the date of direct physical loss or physical damage" and ends when the property should be "repaired, rebuilt or replaced" or the "business is resumed at a new, permanent location." Yet, according to Showa's allegations, the resumption of its operations (onsite dining) would only be achieved if the COVID-19 virus was sufficiently eliminated in the community. Accordingly, the suspension of operations is not and cannot be linked to the period of restoration because the Restaurant could only resume onsite dining if the conditions outside the premises improved, regardless of the lack of the virus at the Restaurant. (Cf. *Inns*, *supra*, 71 Cal.App.5th at p. 704.)

25

In short, the instant matter is not a case where Showa discovered a virus at its Restaurant, took measures to remove that virus, and while taking those measures, had to close a part of its business until the virus was removed from the Restaurant. Indeed, there are no allegations in the first amended complaint that Showa had to close a portion of its business because of the presence of the COVID-19 virus at the Restaurant. Rather, as explicitly alleged in the first amended complaint, Showa operated a business in Orange that partially closed down in response to various government orders, community infection, and the assumption that the COVID-19 virus was everywhere and had infected everyone. Having made those allegations in the previous complaint, we cannot contemplate how Showa could plead a valid action for coverage under the Policy consistent with its earlier allegations. As such, this is not a case where the presence of a virus at the Restaurant caused a "loss or damage" even as that term was interpreted by the First District in *John's Grill*.[11]

---

[11] Because we conclude that Showa cannot plead a cause of action for coverage under the Limited Virus Coverage, we do not address Showa's arguments that the Virus Exclusion is illusory or should not be enforced because it was not sufficiently conspicuous, plain, or clear.

26

DISPOSITION

The judgment is affirmed.  Parties are to bear their own costs.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DATO, J.